FILED

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

99 NOV -1   AM 9: 28

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| VIRGINIA B. YOUNG, | ) | |
| PLAINTIFF, | ) | |
| VS. | ) | CV-98-H-1740-E |
| BELLSOUTH TELECOMMUNICATIONS, | ) | |
| INC., and BELLSOUTH PUBLIC | | |
| COMMUNICATIONS, INC., | ) | |
| DEFENDANTS. | ) | |

ENTERED

NOV - 1 1999

## MEMORANDUM OF DECISION

The Court has before it the August 31, 1999 motion of

defendants BellSouth Telecommunications, Inc. and BellSouth

Public Communications, Inc. (collectively "BellSouth") for

summary judgment.  Pursuant to the Court's September 2, 1999

order, the motion was deemed submitted, without oral argument, on

September 30, 1999.

### I. Procedural History

Plaintiff Virginia B. Young commenced this action on July 6,

1998 by filing a complaint alleging years of continual harassment

by a co-employee.  (See Compl. ¶ 4.)  Plaintiff's complaint

attempts to state a claim for hostile work environment sexual

harassment.  Defendants' August 31, 1999 motion for summary

44

judgment simply asserts that no genuine issue of material fact

exists and that defendants are entitled to judgment as a matter

of law.   (See Defs.' Mot. Summ. J.)

The parties have each filed briefs and submitted evidence in

support of their respective positions concerning the pending

motion for summary judgment.  On August 31, 1999, in addition to

filing their motion for summary judgment, defendants also filed a

memorandum of law and submitted evidence[1] in support of the

motion.   Plaintiff submitted evidence[2] in opposition to the

---

[1]   Defendants submitted the June 25, 1999 deposition of
Virginia B. Young with exhibits; excerpts from the August 5, 1999
deposition of Johnny McGinnis; excerpts from the August 5, 1999
deposition of Walter H. Williams, Jr.; the August 26, 1999
affidavit of Charles Chambers with exhibit; the August 27, 1999
affidavit of Frances Doherty; the August 28, 1999 affidavit of
Robert Mason with exhibit; the August 27, 1999 affidavit of
Johnny Rimes with exhibits; and the August 27, 1999 affidavit of
Walter H. Williams, Jr., with exhibit.

[2]   Plaintiff submitted the July 29, 1999 deposition of
Richard Dean; excerpts from the August 5, 1999 deposition of
Annelle Brown Lee; the July 29, 1999 deposition of Robert Mason;
excerpts from the August 5, 1999 deposition of Jerry McGinnis;
excerpts from the August 5, 1999 deposition of Johnny McGinnis;
excerpts from the July 29, 1999 deposition of Wallace Murray; the
July 29, 1999 deposition of Jerry Payne; excerpts from the August
5, 1999 deposition of Johnny Rimes; the July 29, 1999 deposition
of Paula Robertson; excerpts from the July 29, 1999 deposition of
Ann Skipworth; excerpts from the August 5, 1999 deposition of
Walter H. Williams, Jr.; excerpts from the June 25, 1999
deposition of Virginia B. Young; the August 13, 1999 statement of
Virginia B. Young; the May 1, 1996 statement of Virginia B.
Young; the October 31, 1997 Response of BellSouth Public

motion on September 23, 1999 and filed an opposing brief on September 30, 1999.

## II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. Id. at 323. Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions of file, designate specific facts showing that there is a genuine issue for trial. Id. at 324.

---

Communications to the Request for Information by the Equal Employment Opportunity Commission; the BellSouth Public Communications Sexual Harassment Policy; and the BellSouth Public Communications Internal Complaint Procedures.

The substantive law will identify which facts are material and which are irrelevant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  Id. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991)(en banc)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial.  Fitzpatrick, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant,

4

probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to <u>affirmatively</u> show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question. This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case. <u>Fitzpatrick</u>, 2 F.3d at 1115-16. If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to

withstand a directed verdict, or the non-moving party may come
forward with additional evidence sufficient to withstand a
directed verdict motion at trial based on the alleged evidentiary
deficiency.  However, when responding, the non-movant can no
longer rest on mere allegations, but must set forth evidence of
specific facts.  <u>Lewis v. Casey</u>, 518 U.S. 343, 358 (1996) (citing
<u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 561 (1992)).

### III. Relevant Facts

Plaintiff began her current employment with BellSouth in the
late 1980s.  (<u>See</u> Dep. of Virginia B. Young 16.)  Plaintiff was
at first a temporary operator.  (<u>See</u> <u>id.</u> at 20.)  In 1990, after
the operator position was eliminated, plaintiff became a service
technician in the Oxford and Anniston, Alabama area.  (<u>See</u> <u>id.</u>
20-22.)  Once a service technician, plaintiff began to experience
problems with co-employee Wallace Murray.[3]

Plaintiff alleges that Murray first harassed her shortly
after she became a service technician.  (<u>See</u> <u>id.</u> at 42-43.)  One
day while returning to the work center, Murray asked plaintiff if
she had ever had an affair and stated that he wished to have one.
Plaintiff interpreted Murray's comments as a proposition and

---

[3]  Murray was originally named a defendant in the present
action but was dismissed in the Court's July 23, 1998 order.

declined.  Following plaintiff's rejection, Murray discontinued the subject.  (See id. 44.)  At the time, plaintiff did not mention the incident to anyone at BellSouth.  (See id. 46.)

Later in 1990 or early in 1991, while on a service call, Murray grabbed plaintiff's buttocks.  (See id. at 50.)  When Plaintiff requested that Murray stop, he complied and never again touched plaintiff in an offensive manner.  (See id. at 50-51.)  Following this incident, plaintiff asked the supervisor not to assign her to work with Murray but never filed a formal complaint.  (See id. at 52-53.)  Plaintiff's request was honored and Murray was never subsequently assigned to work with plaintiff.  (See id. at 554-55.)

Although plaintiff and Murray stopped making service calls together, plaintiff still experienced periodic problems with Murray's behavior as well as other problems at work, which plaintiff attributes to Murray.  In May of 1992, Murray began generating smacking sounds on his computer in plaintiff's presence.  (See Defs.' Ex. 1 to Dep. of Virginia B. Young 7-8.)  Murray would make the sound when plaintiff entered the work area.  (See Dep. of Virginia B. Young 55.)  Murray also used his computer to generate other, non-sexual sound effects.  (See Dep. of Johnny McGinnis 50-51; Dep. of Wallace Murray 58-59.)  Upon

7

hearing the sounds, supervisor Don Sparks verbally reprimanded Murray and the sounds stopped.  (See Dep. of Johnny McGinnis 65-66; Dep. of Wallace Murray 58-59.)  Plaintiff did not complain about the computer generated sounds at the time they occurred. (See Dep. of Virginia B. Young at 58.)

Murray watched plaintiff at company dinners.  (See id. at 59.)  On at least one occasion, Murray stole plaintiff's chair during a work-related meeting.  Plaintiff left her seat to introduce a speaker.  When plaintiff returned to her seat, she discovered that Murray had taken the chair and was sitting where she had been seated.  (See id. at 59-60.)

In 1993 or 1995, several incidents occurred within a short period.  (See id. at 90-91, 168; May 1, 1996 Statement of Virginia B. Young 1.)  Following a power outage caused by a hurricane, plaintiff and co-employee Richard Bryant were assigned to deliver portable generators to other employees.  (See Dep. of Virginia B. Young at 66.)  Plaintiff and Bryant first delivered a generator to Murray and were then dispatched to connect another generator.  (See id. at 67-68.)  While in route to the new assignment, plaintiff heard Murray ask another employee over the BellSouth radio network whether Bryant had arrived yet and whether the "seat cover" (referring to plaintiff) was still with

8

Bryant. (See id. at 70.) Murray allegedly then remarked that "it's going to be party time tonight." (Id. at 71.) On this occasion, plaintiff did complain to Murray's supervisor and to her own supervisor. (See id. at 81.) Murray's supervisor informed him of plaintiff's feelings regarding the incident and instructed Murray to cease making the offensive comments in plaintiff's presence. (See Dep. of Jerry Payne 14-15.)

The morning after the "seat cover" and "party time" incidents, Murray again used the term "party time" in plaintiff's presence. (See Dep. of Virginia B. Young 86.) Plaintiff then discussed with Murray her displeasure with his conduct and requested that Murray stop. (See id. at 89-90.) Plaintiff also complained to her supervisor, who requested that plaintiff report any further problems. (See id. at 93.) Murray's supervisor also instructed Murray not to have contact with plaintiff. (Id.) Later, the phrase "party time" was found written on a dry erase board at the work center but no evidence linked Murray to the incident and plaintiff did not recognize the handwriting. (See id. at 95-96.) Following the reprimands, Murray's use of the term "party time" continued sporadically for a few weeks but then ceased. (See id. at 96.)

In 1994 or 1995, Murray expressed to another co-worker

9

hostility to the idea of having plaintiff assist him in moving

several generators.  (See Dep. of Jerry McGinnis 16-17, 22.)

Murray requested help from a male employee and stated that he did

not want help from "Jennie or a cheerleader."  (Id. at 16.)  The

other employee took the comment to mean that Murray wanted

assistance from someone physically strong and that Murray did not

believe plaintiff physically strong enough to move the

generators.  (See id. at 17.)

     In January of 1996, plaintiff discovered a wrapped condom in

her cubicle.  (See May 1, 1996 Statement of Virginia B. Young 1-

2.)  It was found the day after plaintiff referred a service

problem to Murray's work group.  Plaintiff had earlier determined

the source of the service problem and Murray requested that

plaintiff's supervisor come to the site.  (See Dep. of Virginia

B. Young 99-100, 102-103.)  Murray discovered the source of the

service problem after plaintiff's supervisor explained

plaintiff's diagnostic method, and Murray was embarrassed.  (See

id. at 103.)  Upon discovering the condom the next day, plaintiff

took it and later threw it out her car window.  (See id. at 104-

05.)  Although plaintiff was aware of BellSouth's sexual

harassment policy, she did not report the first condom incident

when it occurred, but did inform her supervisor several weeks

10

later and was instructed to report any future incidents. (See id. at 108-10.)

On April 17, 1996, plaintiff again found a new condom in her cubicle. (See May 1, 1996 Statement of Virginia B. Young 2.) Earlier, plaintiff had discovered that Murray was making complaints to her supervisor, informing plaintiff's supervisor of plaintiff's location and questioning whether plaintiff should be at that location. (See Dep. of Virginia B. Young 117-18.) Plaintiff complained to her supervisor about Murray's activities and upon returning to her cubicle, plaintiff discovered the condom. (See id. at 118.) Plaintiff immediately reported this second condom incident to her supervisor. (See id. at 120.) BellSouth security was contacted and Murray was implicated by another employee during the ensuing investigation. (See id. at 121-122; Dep. of Paula Robertson 18-19; Dep. of Ann Skipworth 17-23.) Although Murray denies any involvement in the condom incident, he was suspended from work for ten days as a result of the investigation. (See Dep. of Wallace Murray 48-49.) Murray filed a grievance with his union and the suspension was reduced to five days. (See id. at 50, 52-53.)

Approximately six months after the second condom incident, plaintiff noticed personal property missing from her work area.

11

(See Dep. of Virginia B. Young 140, 162.)  A cross-stitch hanging
and three different photographs of plaintiff's grandchildren were
found missing from plaintiff's work area on separate occasions.
(See id. at 60-64.)  Plaintiff notified her supervisor and
BellSouth security about the vanishing property.  (See id. at
162.)  In response, BellSouth security officer Johnny Rimes
installed a surveillance camera above plaintiff's work area;
after the camera was installed, no additional property was
reported missing and the camera did not detect any property being
taken.  (See Dep. of Johnny Rimes 37-39.)  The camera was
eventually removed because the thefts had ended.  (See id. at
39.)  No determination was ever reached as to the identity of the
person who had removed the cross-stitch picture and photographs.
(See id.)

     Also following the second condom incident, Murray at least
twice parked a trailer in such a manner as to obstruct access to
the plaintiff's normal parking space.  (See Dep. of Virginia B.
Young 128, 133-35.)  Plaintiff's work center does not have
assigned parking, but plaintiff generally parks in the same space
each day.  (See id. at 128.)  Plaintiff reported the second
incident to a supervisor but did not implicate Murray.  (See id.
at 134-35.)  Murray's supervisor, Jerry Payne, questioned him

                                   12

Case 1:98-cv-01740-JHH   Document 44   Filed 11/01/99   Page 13 of 32

concerning the trailer incident and Murray indicated that he was not aware of blocking the parking space. Payne verbally reprimanded Murray and instructed him to be more careful. (See Dep. of Jerry Payne at 34-35.) The trailer had been moved by the next day. (See Dep. of Virginia B. Young at 134.)

At some other point between April of 1996 and July of 1997, Murray began parking his company vehicle in the area near the coin vault blocking access to the vault, where plaintiff needed to park to unload pay telephone coin receptacles. (See id. at 141-42.) Murray did have a legitimate reason to park in the area, however. (See id. at 142.) Murray would park in the area to unload his own vehicle and admits that he may have, inadvertently, blocked access to the coin vault. (See Dep. of Wallace Murray 82-84.) Plaintiff reported the incidents to Murray's supervisor. (See Dep. of Virginia B. Young 142.) Murray continues periodically to block access to the coin vault. (See id. at 176.)

The next distinct incident occurred on July 28, 1997 when plaintiff's new car was scratched in the BellSouth work center parking shed. (See id. at 167.) At plaintiff's request, a co-employee moved plaintiff's new car from the employee parking lot to the shed used for parking company vehicles; the car was moved

13

in anticipation of a predicted hail storm. (See id. at 145.)
After the car had been moved, another employee asked to see the
vehicle. (See id. at 146.) At that time, plaintiff discovered
that the hood of the car had been scratched, apparently
intentionally, with a key. (See id. at 147.) The plaintiff
complained to BellSouth management; both the local police and
BellSouth security investigated the incident but plaintiff was
not cooperative with BellSouth security. (See id. at 151, 154,
156-57.) Although Murray was suspected in the keying incident,
no one ever proved that Murray had actually scratched the car and
no one was ever arrested for the incident.[4] (See id. at 156,
158.)

In the fall of 1998, plaintiff found metal shelving blocking
her normal parking space; Murray and another co-employee had been
seen moving the shelving. (See id. at 169-70; Dep. of Johnny
McGinnis 15, 26.) Following the shelving incident, supervisor
Jerry Payne questioned Murray, who implicated Johnny McGinnis in
blocking plaintiff's parking space. Payne then questioned
McGinnis, who admitted moving the shelves, and Payne was
satisfied. (See Dep. of Jerry Payne 31-32.)

---

[4] As noted later, plaintiff filed her EEOC charge three
days after the keying incident.

14

In June or July of 1999, Murray made a comment to Johnny McGinnis concerning a "car sandwich." (See Dep. of Johnny McGinnis 15, 26.) "Car sandwich" referred to the fact that plaintiff's co-employees had begun parking on either side of her personal vehicle to prevent damage. Apparently, Murray was not pleased with this development and expressed dislike for the "car sandwich" to both McGinnis and Terry Young. (See id.; Dep. of Virginia B. Young 172-74, 207; Dep. of Wallace Murray 21-22.)

The most recent distinct event allegedly involving Murray occurred on August 5, 1999. (See Aug. 13, 1999 Statement of Virginia B. Young.) After attending depositions in the present litigation, plaintiff placed a long-distance telephone call to a former co-employee. During the conversation, plaintiff heard clicking, as though someone were listening to the conversation. Plaintiff ended the call and was informed a few minutes later by her son that a man meeting Murray's description was at a nearby crossbox with a handset to his ear. Plaintiff did not go to the crossbox to identify the listener but reported the incident to BellSouth security. (See id.)

In addition to the above specific incidents, plaintiff also reports several more general characteristics of Murray's reactions to plaintiff's presence at BellSouth. These include

15

Murray's sometimes apparent preoccupation with plaintiff.  (See Dep. of Johnny McGinnis 25-26.)  For instance, on one occasion Murray noticed a bouquet of roses in plaintiff's work area and apparently read the card, which plaintiff had written.  (See Dep. of Virginia B. Young 129-32.)  Murray also makes disparaging comments to other co-employees about plaintiff, such as relaying accounts of an alleged liaison between plaintiff and another worker.  (See Dep. of Paula Robertson 28-29.)  In addition, Murray supposedly becomes upset when other workers interact with plaintiff, and scolds them later.  (See Dep. of Virginia B. Young 132-33, 171.)

On July 31, 1997 plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging sexual harassment by a co-worker and retaliation by BellSouth for reporting the harassment.  (See EEOC Charge 130973036.)  Subsequently, the EEOC issued plaintiff a right to sue letter dated April 6, 1998.  (See Dismissal and Notice of Rights in EEOC Charge No. 130973036.)  Plaintiff then timely filed her complaint in the present action on July 6, 1998.

**IV. Applicable Substantive Law and Analysis**

Plaintiff's complaint contains a single claim of hostile

16

work environment sexual harassment[5] arising from numerous

distinct and indistinct incidents involving, or arguably

involving, Wallace Murray and stretching over the better part of

a decade.  Defendants' motion for summary judgment merely asserts

that no genuine issue of material fact exists and that defendants

are entitled to judgment as a matter of law.  Because a claim of

hostile environment sexual harassment is actionable under Title

VII,[6] before addressing the substance of defendants' motion for

summary judgment, the court must first decide, in light of the

brief statute of limitations in Title VII cases, which of the

numerous incidents cited by plaintiff may properly be considered

as bases for plaintiff's sexual harassment claim.

---

[5]  In her initial EEOC charge, plaintiff also alleged
retaliation for reporting incidents of sexual harassment to
BellSouth.  (See EEOC Charge 130973036.)  In her brief, plaintiff
mentions retaliation in the form of denial of overtime, and
defendants also address the retaliation issue at some length in
their memorandum of law in support of summary judgment.  (See
Pl.'s Br. 17; Defs.' Mem. 15-17.)  Upon carefully examining the
complaint with all the generosity due a then pro se plaintiff,
however, the Court concludes that plaintiff did not even attempt
to state a claim for retaliation.  (See Compl. ¶ 4.)
Consequently, the Court will not consider any claim for
retaliation.  A court need not construct for plaintiff a cause of
action that plaintiff does not actually plead.  See Maniccia v.
Brown, 171 F.3d 1364, 1367 n.1 (11th Cir. 1999) (citing Case v.
State Farm Mut. Ins. Co., 294 F.2d 676, 678 (5th Cir. 1961)).

[6]  See, e.g., Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57,
66, 73 (1986).

## 1.  Statute of Limitations for Title VII Claims

The present action is based upon plaintiff's July 31, 1997
EEOC charge of discrimination.  Under Title VII, a charge of
discrimination must "be filed within one hundred and eighty days
after the alleged unlawful employment practice occurred . . . ."
42 U.S.C. § 2000e-5(e)(1) (1994).  Therefore, normally only those
incidents occurring within the 180 days preceding the charge of
discrimination may serve as bases for a discrimination claim.
See Calloway v. Partners Nat'l Health Plans, 986 F.2d 446, 448
(11th Cir. 1993).  However, the continuing violation doctrine
provides an exception to this general rule.  See id.; Beavers v.
American Cast Iron Pipe Co., 975 F.2d 792, 796 (11th Cir. 1992).

Under the continuing violation doctrine, plaintiffs who can
demonstrate a discriminatory pattern or practice extending beyond
the statutory 180 day period may have those claims falling
outside the limitations period considered.  See Beavers, 975 F.2d
at 796-97 (discussing the distinction between a continuing
violation and the long-term effects of a single violation.)   See
also Hardin v. S.C. Johnson & Sons, Inc., 167 F.3d 340, 344 (7th
Cir. 1999) ("This doctrine is designed to 'accommodate plaintiffs
who can show that there has been a pattern or policy of
discrimination continuing from outside the limitations period

18

into the statutory limitations period, so that all discriminatory acts committed as part of this pattern or policy can be considered . . . timely.'") (quoting Peatzold & O'Leary, Continuing Violations and Hostile Environment Sexual Harassment: When is Enough, Enough?, 31 Am. Bus. L.J. 365 (1994))). The doctrine does, though, have qualifications to prevent a wholesale end run around the 180 day limit. First, the continuing violation doctrine applies only when the earlier acts could not be recognized at the time of their occurrence as actionable behavior or when requiring the plaintiff to proceed with a claim at the time of occurrence of the earlier acts would otherwise be unreasonable. See Galloway v. General Motors Serv. Parts Operations, 78 F.3d 1164, 1166-67 (7th Cir. 1996); Roberts v. Gadsden Mem'l Hosp., 850 F.2d 1549, 1550 (11th Cir. 1988). Furthermore, a causal nexus must exist linking the acts outside and within the statutory period together to form a continuous chain of violations, see Milton v. Weinberger, 645 F.2d 1070, 1077 (D.C. Cir. 1981); in determining whether such a nexus exists a court may consider the subject matter, frequency, and permanence of the acts. See Berry v. Board of Supervisors, 715 F.2d 971, 981 (5th Cir. 1981); Mallone v. K-Mart Corp., 51 F. Supp. 2d 1287, 1301 (M.D. Ala. 1999).

The Court finds that the allegedly harassing acts committed by Murray before the 180 days immediately preceding plaintiff's EEOC charge are not part of a continuing violation. First, the proposition and buttocks grab in 1990 or 1991 and the condom incidents in 1996 are so outrageous that no reasonable person could have failed to recognize their impropriety and the need to take immediate action. Furthermore, assuming arguendo, that the other, less obviously inappropriate acts constituted a continuing pattern of harassment rather than a series of isolated, distinct incidents, the plaintiff should have recognized long ago the existence of a claim and taken proper action; she may not now seek to assert a claim based on events that occurred outside the 180 day period. See Galloway, 78 F.3d at 1167 ("[W]hile she can still sue provided that the last act of harassment occurred within the statute of limitations, she cannot reach back and base her suit also on conduct that occurred outside the statute of limitations; for she had no excuse for waiting that long."). However, even if the Court were to find that plaintiff could be excused for not filing a claim earlier, plaintiff's continuing violation theory would still fail because of the lack of nexus among the earlier incidents.

Apart from the question of excusable neglect in pursuing

20

earlier claims, the Court does not find the existence of an
unbroken pattern of harassment but rather finds that the
incidents occurring prior to January of 1997 lack the similarity
and frequency to create a continuous chain of harassment.  The
incidents are of vastly different types, ranging from an inquiry
about an affair to improper touching to suggestive computer-
generated sounds to offensive comments to chair stealing to
obstructing parking spaces to property theft.  More importantly,
these incidents were not everyday occurrences but happened, often
in concentrated bursts, at widely spaced intervals over a period
of years.  The first incidents (the proposition and buttocks
grab) occurred in 1990 or early 1991, the smacking sounds in the
spring of 1992, additional incidents (the "seat cover" and "party
time" comments) in 1993 or 1995, another isolated incident (the
"cheerleader" comment) in 1994 or 1995, the condom incidents in
January and April of 1996, and more incidents (the missing cross-
stitch and photographs) six months later still.  Such gaps are
simply too great to satisfy the frequency and permanence factors.
See, e.g., Konstantopoulos v. Westvaco Corp., 112 F.3d 710, 716
(3d Cir. 1997) (seven month interval).  Because Murray's conduct
prior to 1997 cannot reasonably be found to form an uninterrupted
chain of harassing conduct constituting a continuing violation of

21

Title VII, any conduct occurring before January of 1997 is not
actionable.

Murray's conduct since January of 1997, however, warrants a
different outcome. Starting in 1997, the frequency of Murray's
purportedly harassing conduct increased and continued after the
filing of plaintiff's EEOC charge and the filing of this lawsuit.
The Court therefore finds that Murray's conduct from January of
1997 to present should be considered as a continuous pattern or
course of conduct for the purposes of the present motion and may
form the bases of plaintiff's hostile environment sexual
harassment claim. Because the record is not clear as to the
precise dates of certain recent incidents, the Court, with
considerable generosity to plaintiff, includes the following
incidents in the chain of events upon which plaintiff may premise
her Title VII action: the theft of at least two photographs from
plaintiff's work area, the parking of a trailer so as to obstruct
plaintiff's customary parking space on at least one occasion, the
parking of Murray's work vehicle so as to obstruct access to the
coin vault, the keying of plaintiff's new car, the placing of
metal shelving so as to obstruct access to plaintiff's customary
parking space, the "car sandwich" comment in June of 1999, and
the wiretapping incident of August 1999. The Court will also

22

consider Murray's alleged scolding of male co-employees for interacting with plaintiff.  Having determined what actions may serve as the bases of plaintiff's lawsuit, the Court now turns to a consideration of plaintiff's sexual harassment claim.

## 2.  The Hostile Work Environment Sexual Harassment Claim

As previously discussed, plaintiff presents a claim of sexual harassment under Title VII predicated upon a hostile work environment created by a co-employee's actions.  Title VII provides that an employer shall not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e-2(a)(1) (1994) (emphasis supplied).  "[A] plaintiff may establish a violation of Title VII by proving that discrimination based on sex created a hostile or abusive work environment." Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 66 (1986). However, Title VII is not "a general civility code" nor does it "reach genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998).  Not even all harassing or inappropriate conduct is prohibited.  Rather, Title VII applies to only that

23

conduct which is "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" Meritor, 477 U.S. at 67 (quoting Henson v. City of Dundee, 682 F.2d 897, 904 (11th Cir. 1982)). The severity of the behavior in each case must be evaluated both objectively and subjectively considering all the circumstances, see Oncale, 523 U.S. at 81, and only the most extreme sexually harassing conduct will be found to violate Title VII. See Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998); Oncale 523 U.S. at 81-82.

Although a critical element of a claim of hostile work environment sexual harassment, a showing of such severely or pervasively hostile conduct as to affect a term or condition of employment standing alone is insufficient to find a violation of Title VII. An employee alleging hostile work environment sexual harassment must demonstrate, in addition to (1) a showing that the harassment affected a term, condition, or privilege of employment, (2) that the employee is a member of a class protected under Title VII; (3) that the employee has suffered undesired harassment; and (4) that the harassment was motivated by sex. See Henson v. City of Dundee, 682 F.2d 897, 903-04 (11th Cir. 1982). Additionally, in cases, such as this, alleging a

24

hostile work environment created by a co-employee (as opposed to a supervisor), courts have consistently applied a negligence standard for employer liability, finding against the employer only when the employer knew or should have known of the harassment yet failed to take appropriate remedial measures.[7] See Faragher, 524 U.S. at 799 (citing numerous cases, including Fleming v. Boeing Co., 120 F.3d 242, 246 (11th Cir. 1997)).  See also 29 C.F.R. § 1604.11(d) (1998) ("With respect to conduct between fellow employees, an employer is responsible for acts of sexual harassment in the workplace where the employer (or its agents or supervisory employees) knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action.")

Here, the Court need not reach the question of employer liability, however, because plaintiff has not made a prima facie showing of a hostile work environment. Although plaintiff is within the class protected from sexual harassment and any harassment was unwanted, plaintiff has failed to sufficiently demonstrate that any harassment was so severe as to affect a term

---

[7] The same standard also applies for harassment by non-employees. See 29 C.F.R. § 1604.11(e) (1998) (applying "known or should have known" standard to employer liability).

or condition of employment or that any harassment was on account of her sex. See Henson, 682 F.2d at 903-04 (listing elements of hostile environment claim). See also Edwards v. Wallace Community College, 49 F.3d 1517, 1521-22 (11th Cir. 1995) ("In deciding whether a hostile environment was created factors to consider include the frequency of the discriminatory conduct, the severity of the discriminatory conduct, whether the conduct is threatening or humiliating, and whether the conduct unreasonably interferes with the plaintiff's performance at work.") Taking as true all of the conduct allegedly undertaken by Murray since the start of 1997, the Court concludes that the incidents described by plaintiff, consisting primarily of obstructing plaintiff's parking and keying her car, are childish, petty, unprofessional, and mean-spirited, but they are not so severe, threatening, humiliating, or disruptive as to rise to the extreme and egregious level required to create an actionably hostile work environment. Compare Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 77 (1998) (employee "forcibly subjected to sex-related, humiliating actions" and "physically assaulted" and "threatened . . . with rape") and Splunge v. Shoney's, Inc., 97 F.3d 488, 489 (11th Cir. 1996) (not contested that hostile environment created when "employees grabbed Plainitffs, commented

26

extensively on their physical attributes, showed them

pornographic photos and videotapes, offered them money for sex,

favored other employees who had affairs with them, speculated as

to the plaintiffs' sexual prowess, and so on") and Cornwall v.

Robinson, 23 F.3d 694, 698-700, 702, 706-07 (2d Cir. 1994)

(upholding finding that repeated derogatory comments, physical

threats, lewd gestures, proposition, ripping plaintiff's blouse,

public castigation, physical attacks, and ostracism created

hostile environment) with Sprague v. Thorn Ams., Inc, 129 F.3d

1355, 1366 (10th Cir. 1997) (finding five "boorish" incidents

over sixteen months, including looking down plaintiff's blouse,

not actionable) and Gleason v. Mesirow Fin., Inc., 118 F.3d 1134,

1144-46 (7th Cir. 1997) (finding use of expletives, condescension

toward desk employees, telling of weekend at nudist camp, and

relating dream about plaintiff not actionable) and Galloway v.

General Motors Serv. Parts Operations, 78 F.3d 1164, 1168 (7th

Cir. 1996) (finding indefinite repetitions of "sick bitch" over

four-year period "too tepid or intermittent or equivocal to make

a reasonable person believe that she has been discriminated

against on the basis of her sex") and Saxton v. American Tel. &

Tel. Co., 10 F.3d 526, 528-29, 534-35 (7th Cir. 1993) (finding

supervisor's sexual advances, including kissing plaintiff and

27

grabbing at plaintiff, and supervisor's negative attitude

following rejection by plaintiff did not create actionably

hostile environment) and Ebert v. Lamar Truck Plaza, 878 F.2d

338, 339 (10th Cir. 1989) (affirming finding that repeated but

occasional foul language and unwanted touching did not create

actionably hostile environment) and Jones v. Flagship Int'l, 793

F.2d 714, 720-21 (5th Cir. 1986) (agreeing with trial court's

conclusion that repeated propositioning of plaintiff and exposing

of plaintiff to bare-breasted figurines did not create actionably

hostile work environment) and Jones v. Clinton, 990 F. Supp. 657,

664, 675-76 (E.D. Ark. 1998) (finding that then-Governor

Clinton's exposing himself to plaintiff and requesting sexual act

insufficient to create hostile environment) and Fox v. Ravina

Club, Inc., 761 F. Supp. 797, 799-801 (N.D. Ga. 1991) (finding

that sexual jokes and comments suggesting plaintiff prostitute

herself to attract members and to receive promotions and

statement that plaintiff was a "cold northern bitch" followed by

suggestion that she "say yes once in a while" to "us southern

boys" did not create actionably harassing environment) and

Christoforou v. Ryder Truck Rental, Inc., 668 F. Supp. 294, 298-

301 (S.D.N.Y. 1987) (finding that, even if believed, plaintiff's

allegations that supervisor propositioned her, repeatedly placed

28

his hands on plaintiff's breasts and buttocks, bothered plaintiff as she worked, attempted to kiss plaintiff, and made rude or suggestive comment to plaintiff did not establish actionable hostile environment).

Additionally, although plaintiff has presented evidence that Murray does not like her on a personal level, she has not demonstrated that the allegedly harassing conduct was motivated by gender-based animus. That the incidents which are the bases of plaintiff's hostile environment claim are not sexual in nature is not necessarily fatal because "harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex." Oncale, 523 U.S. at 80. See also Andrews v. City of Philadelphia, 895 F.2d 1469 (3d Cir. 1990) (holding that "the offensive conduct is not necessarily required to include sexual overtones in every instance"); Henson, 682 F.2d at 904; Robinson v. Jacksonville Shipyards, 760 F. Supp. 1486, 1522 (M.D. Fla. 1991) (citing additional cases). However, as the Supreme Court recently re-emphasized, any harassment must "actually constitute[] 'discrimina[tion] . . . because of . . . sex.'" Oncale, 523 U.S. at 80 (quoting Title VII). "In proving a claim for hostile work environment due to sexual harassment, therefore, the plaintiff must show that but for the fact of her

sex, she would not have been the object of harassment." Henson, 682 F.2d at 904. To support her argument of gender-motivated behavior, plaintiff points to the experiences of other female employees with Murray. (See Pl.'s Br. at 14-15.) The incidents cited, though, generally differ from those about which plaintiff complains in that the other incidents often possessed an overt sexual overtone, and the more similar, non-sexual incidents, are too remote in time to be considered. Plaintiff also points to the isolated "cheerleader" comment, made to another worker, as evidence of a gender-based animus, but the remark, made in 1994 or 1995, is also too remote from the incidents in question to be considered evidence of Murray's purported bias against women at the time of the events which are the basis of the current litigation. Furthermore, standing alone, the remark is insufficient to demonstrate gender-bias or constitute actionable harassment even if it had been directed at plaintiff. Cf. Galloway v. General Motors Serv. Parts Operations, 78 F.3d 1164, 1167-68 (7th Cir. 1996) (stating that single utterance of "sick bitch" not actionable and finding that term not sex or gender related in context). Similarly Murray's "car sandwich" and other comments to fellow workers and his scolding of his friends who deign to interact with plaintiff are, in light of Murray's

30

beliefs that plaintiff desired his job and had lied to his
supervisor and other craft employees about him, more indicative
of purely personal dislike rather than sex-based animus (see Dep.
of Virginia B. Young 90; Dep. of Wallace Murray 24, 25, 103-04);
plaintiff's evidence does not so controvert this personal
animosity motive as to create a genuine issue of material fact.
Cf. Galloway, 78 F.3d at 1168 (commenting that evidence showed
harassment because of personal animosity rather than sex).   To
summarize, plaintiff has simply not sufficiently demonstrated
that Murray's alleged behavior was actually motivated by
plaintiff's sex as opposed to the blatant personal animosity
between plaintiff and Murray or some other non-prohibited reason
as to avoid summary judgment.   See Henson, 682 F.2d at 904.   See
also Galloway, 78 F.3d at 1168.   Cf. St. Mary's Honor Ctr. v.
Hicks, 509 U.S. 502, 508 (1993) ("In short, the District Court
concluded that 'although [respondent] has proven the existence of
a crusade to terminate him, he has not proven that the crusade
was racially rather than personally motivated.'" (quoting 756 F.
Supp. at 1252)).

        In conclusion, the Court finds that plaintiff has failed to
establish a prima facie case of hostile work environment sexual
harassment.   Because no material issues of fact remain and

31

because defendants BellSouth Telecommunications, Inc., and
BellSouth Public Communications, Inc., are both entitled to
judgment as a matter of law as to plaintiff's claim, summary
judgment in favor of defendants is appropriate.  A separate order
will be entered.

DONE this $\frac{1^{st}}{}$ day of November, 1999.

SENIOR UNITED STATES DISTRICT JUDGE

32